Arthur L. Parker v. Commissioner.
Parker v. Commissioner
Docket No. 3431.
United States Tax Court
1945 Tax Ct. Memo LEXIS 231; 4 T.C.M. (CCH) 449; T.C.M. (RIA) 45147; April 18, 1945
*231 J. Marvin Haynes, Esq., 916 Investment Bldg., Washington, D.C., and W. C. Magathan, Esq., for the petitioner. E. M. Woolf, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent has determined deficiencies of $9,348.25 and $1,907.52 in petitioner's gift tax for the years 1939 and 1940, respectively, which petitioner assails by this proceeding. The sole controversy relates to the fair market value at the time of the gift of 250 shares of common stock of The Parker Appliance Company. The deficiency for 1940 is entirely dependent upon the value determined for the gifts in 1939. Findings of Fact Petitioner is an individual residing in Shaker Heights, Ohio. The gift tax returns for the periods in question were filed with the collector for the eighth district of Ohio. On January 10, 1939, petitioner donated 50 shares of common stock of The Parker Appliance Company to each of five trusts of which petitioner's wife and four children, respectively, were the beneficiaries. Petitioner is an engineer, manufacturer and executive, having graduated from the Case School of Applied Science, Cleveland, Ohio, about 1907. In 1914 petitioner *232 invented and patented an air brake control for motor vehicles. The manufacture of this patent device was started in 1917 by a corporation known as Parker Appliance Company which incurred financial difficulties and was wound up in 1924 by voluntary bankruptcy proceedings. Later, petitioner invented and patented certain valves and couplings. The first patent was issued about 1927 and on December 31, 1938. petitioner owned 34 patents on valves and couplings. These valves and couplings are used primarily in connection with seamless tubing used for conducting fluid and fluid power useful in power plants and similar enterprises. They are also used by the aircraft industry for the conveyance of liquids and power in airplanes. The manufacture of these valves and couplings was started by petitioner in 1924 following the bankruptcy of Parker Appliance Company. Petitioner conducted this new business as a sole proprietorship until December 31, 1938, when the assets and business (except patents and patent applications) subject to the liabilities of the business, were transferred to The Parker Appliance Company as of the close of business December 31, 1938. The Parker Appliance Company was incorporated *233 under the laws of the State of Ohio on December 30, 1938, with authorized capital stock of 3,000 shares preferred no par value and 1,000 shares common no par value. Petitioner received in exchange for the above assets of the sole proprietorship 1,000 shares of common stock and 2,000 shares of preferred stock of The Parker Appliance Company. Petitioner in this manner became the owner of all the issued and outstanding common and preferred stock of that corporation. On January 10, 1939, petitioner donated 250 shares of the common stock to the five abovementioned trusts. The Parker Appliance Company was incorporated by petitioner to establish a more orderly estate. By operating as a sole proprietorship, all of petitioner's personal assets were involved in the proprietorship and it seemed impractical to divide that estate among his family. It was petitioner's purpose in incorporating the proprietorship to facilitate the gifts of interest and to remove his patents from the risks of the business. About 50 percent of the production of the sole proprietorship was sold to the aircraft industry and 50 percent to industrial users such as railroads, power plants, and oil refineries. There *234 was inevitable and considerable change in the articles produced. A major contributing factor to the success of the sole proprietorship was the fact that the company engineered the product after it was sold. Couplings or fittings that went into a power plant required many and continuous changes to insure satisfactory installation. Development work was more or less continuous. The sole proprietorship had comparatively no sales force in the commonly accepted meaning of that term; sales engineers and engineering work constituted most of the selling. The business of the sole proprietorship was built around petitioner and his skilled assistants. It was a specialized business. Petitioner was the dominating factor in nearly every activity of the organization. All of the inventions which had been patented and were owned by petitioner had been developed by him personally, there being no engineering staff or employees qualified as graduate engineers. The sole proprietorship had in its employ young men doing drafting work who had had technical high school education and who had been trained by petitioner as engineers. Other than petitioner the sole proprietorship did not have anyone in its organization *235 who had evidenced capability of inventing and securing a patent on any devices that were being manufactured and sold by the sole proprietorship. When the corporation was formed it was planned that the corporation would continue with the manufacture and sale of petitioner's patented devices under a royalty license agreement but without any rights to subsequent inventions of petitioner. The following statement sets forth the assets transferred by petitioner to The Parker Appliance Company on December 31, 1938, the liabilities of the sole proprietorship assumed by that company, the capital stock issued for the net assets and the paid-in surplus allocated to the common and preferred stock: Audit
Per Books
Adjustments
As Adjusted
Assets:
Cash
$ 9,969.75
$ 9,969.75
Receivables
85,326.36
$ 16,458.90
101,785.26
Inventories
138,624.84
124,773.92
263,398.76
$233,920.95
$141,232.82
$375,153.77
Fixed assets, less reserves
66,893.64
(802.17)
66,091.47
Prepaid expenses
1,599.37
1,599.37
$300,814.59
$142,030.02
$442,844.61
Liabilities: Notes payable to Euclon and
First Holding Corporations
(wholly owned by petitioner)
$ 40,000.00
$ 40,000.00
Other notes payable
67,000.00
67,000.00
Accounts payable
23,720.76
$ 6,184.37
29,905.13
Accrued expenses
11,424.95
7,756.19
19,181.14
$142,145.71
$ 13,940.56
$156,086.27
Net Assets Transferred
$158,668.88
$128,089.46
$286,758.34
Capital stock issued for net assets: Preferred stock, 2,000 shares at
stated value of $25 per share
(redemption amount $200,000)
$ 50,000.00
$ 50,000.00
Common stock, 1,000 shares at
stated value of $10 per share
10,000.00
10,000.00
Paid-in surplus: Allocated on books to preferred
stock
16,893.64
(802.17)
16,091.47
Allocated on books to common
stock
81,775.24
128,891.63
210,666.87
$158,668.88
$128,089.46
$286,758.34
*236 The book value of 1,000 shares of common stock is $220,666.87 ($220.67 per share) or $86,758.34 ($86.76 per share), depending upon whether the book value of the preferred stock is calculated on the stated value of $25 per share plus an allocation of $16,091.47 of paid-in surplus to the 2,000 shares of preferred stock or is calculated on the redemption price of $200,000 provided under the agreement relating to the issue of the preferred stock. The articles of incorporation provided that the preferred shares were to be preferred as to both earnings and assets and in the event of any liquidation, dissolution or winding-up of the company, or upon any voluntary distribution of its capital or any part thereof, there was to be paid to the holders of the preferred shares out of the assets of the company distributable to its shareholders before participation by holders of the common shares, the sum of $100 per share or a ratable portion of any lesser amount available for the purpose. The holders of preferred shares were to be entitled to receive when and as declared cumulative dividends in cahsh at the rate of but not to exceed $5 per share per annum, payable semi-annually. Petitioner *237 did not transfer to The Parker Appliance Company any patents owned by him or patent applications pending in respect to the valves and couplings. Petitioner, under date of January 3, 1939, entered into a license agreement with The Parker Appliance Company in respect to the 34 patents owned by him. Under the terms of this agreement The Parker Appliance Company acquired an exclusive license to manufacture or have manufactured, use and/or sell any and all of the inventions covered by the patents. And the corporation agreed to pay petitioner a royalty for the license rights of 2 percent of the total net sales of all products sold by it. The license agreement extended to the end of the term of the latest patent granted under which The Parker Appliance Company was given an exclusive license. The Parker Appliance Company could terminate the agreement by three months' notice in writing served upon petitioner. The license agreement was binding upon the heirs and assigns of petitioner and also upon the successors and legal representatives of The Parker Appliance Company. The agreement also provided that if the corporation neglected to pay the royalty provided for in the agreement 30 days after *238 written demand for payment, petitioner might terminate the agreement. The Parker Appliance Company did not receive any rights to any inventions which petitioner might make after the execution of the royalty agreement on January 3, 1939. The fixed assets in the amount of $66,091.47 above referred to represented in part the machinery and equipment used by the sole proprietorship in the manufacture of the patented devices. The balance of the machinery and equipment used by the sole proprietorship was leased from the First Holding Corporation, a corporation wholly owned by petitioner, at $12,000 per year. This same leasing arrangement with respect to machinery and equipment was continued by The Parker Appliance Company. A small part of a large plant owned by Edclon Corporation, another corporation wholly owned by petitioner, had been leased to the sole proprietorship at an annual rental of $48,000. This building rental arrangement was also continued by the corporation. The Parker Appliance Company, on January 3, 1939, fixed the compensation of petitioner as its president at $20,000 per year. The net income of the sole proprietorship for 1933 to 1938, inclusive, before making any *239 adjustment to place the same on a corporate basis, was as follows: 1933
$ 31,488.54
1934
63,914.98
1935
88,017.87
1936
88,597.97
1937
133,859.40
1938
64,963.27
If the sole proprietorship had operated as a corporation during the years 1933 to 1938, inclusive, and had paid the same salary which The Parker Appliance Company had agreed to pay petitioner on January 3, 1939, in the amount of $20,000 per year and had such corporation paid the same royalties at the rate of 2 percent of net sales which The Parker Appliance Company had agreed to pay on January 3, 1939, and had such corporation paid the Federal capital stock taxes and Federal income taxes applicable for these years, the net income of the sole proprietorship, restated on a corporate basis, would be substantially as follows: 1933
$ 5,920.19
1934
31,830.67
1935
49,667.26
1936
45,009.00
1937
74,399.64
1938
17,759.36
The following table sets forth the sales, net income (adjusted to corporate basis) and capital employed by the sole proprietorship for the years 1932 to 1938, inclusive: Net Tangible
Year ending Dec. 31:
Sales
Net Income
Assets
1932
$ 84,143.60
1933
$ 228,427.34
$ 5,920.19
75,752.30
1934
335,592.30
31,830.67
92,110.91
1935
500,676.80
49,667.26
132,813.50
1936
824,445.34
45,009.00
214,806.50
1937
1,341,206.23
74,399.64
297,919.32
1938
1,173,978.31
17,759.36
336,289.30
Averages for six-year pe-
riod - 1933 to 1938, inclu-
sive
37,431.02
176,262.22
Averages for five-year pe-
riod - 1934 to 1938, inclu-
sive
43,733.18
191,615.30
*240 The following is a statement of orders received and shipments by months from 1937 to June, 1939: Orders Received:
1937
1938
1939
January
$ 137,210.76
$ 107,127.32
$113,025.75
February
100,185.24
123,361.41
104,277.60
March
131,151.70
128,147.19
301,304.50
April
131,290.19
95,544.18
125,293.16
May
108,013.11
101,296.17
182,702.78
June
101,294.13
116,211.75
133,247.92
July
93,511.65
83,146,74
August
122,106.17
84,796.46
September
154,386.82
72,722.39
October
97,359.63
195,146.17
November
116,269.76
81,897.36
December
97,737.65
83,497.83
Total
$1,390,516.81
$1,272,894.97
Average
$ 115,876.40
$ 106,074.58
Shipments:
1937
1938
1939
January
$ 81,293.79
$ 105,919.47
$108,157.49
February
103,089.71
96,488.67
115,124.57
March
92,932.34
118,536.36
148,774.02
April
120,622.70
113,392.89
167,998.11
May
118,486.24
113,996.07
195,119.91
June
130,146.74
107,028.24
201,346.45
July
117,481.05
83,861.81
August
118,183.24
83,201.57
September
121,994.52
91,217.81
October
125,331.64
103,428.02
November
132,944.36
87,079.41
December
143,855.25
125,295.25
Total
$1,406,361.58
$1,229,445.57
Average
$ 117,196.80
$ 102,453.80
*241 In the fall of 1938 petitioner went to Europe in an attempt to secure some aircraft business from Europe and to make an English connection. Prior to this time the sole proprietorship had done very little export business. Petitioner was not successful in obtaining any business from Europe and the negotiations for an English outlet for its product did not materialize. The Parker Appliance Company is engaged principally in the manufacture and sale of couplings, fittings, and valves of many types used in oil, fuel, and control lines in aircraft, in hydraulic control systems, in machine tools, and in air, water, oil, chemical, and fuel lines, in manufacturing and power plants. It also manufactures and sells aircraft engine priming pumps, aircraft oxygen, de-icer, vacuum and hydraulic system parts, tube bending and fabricating equipment, and many other related aircraft and industrial parts. Sales of the sole proprietorship for the year 1938 and of the corporation for the six months' period from January 1 to June 30, 1939, were as follows: 6 Months' Pe-
riod Ended
Sales industry
1938
June 30, 1939
Aircraft
$ 631,730
$579,835
All other customers
542.248
310,917
$1,173,978
$890,752
*242 Petitioner's experience with the original Parker Appliance Company was discouraging with any capital other than his own. His preference was toward independent financing. Discussions about public financing would come up from time to time with bankers and others who became interested in the future of the proprietorship. There was no serious thought or analysis of any consequence of public financing until a few months before the financing was consummated through the Paul Davis Company. It was not in petitioner's mind when The Parker Appliance Company was organized. He was aware of the risk that an operator of a proprietorship carries and in a general way thought and evaluated the various possibilities of how to conduct the business, but there was no thought of any public financing in the immediate future. The one thing that that consummated the public financing was acquaintance with Mr. Marcum of the Paul Davis Company, who since the financing has been active in The Parker Appliance Company. The Parker Appliance Company kept its books and records on a fiscal year basis ending June 30th of each year. In order to file its Federal income and excess profits tax returns on the same basis *243 it filed its first return reporting income for the period January 1 to June 30, 1939. On the return it reported gross sales of $891,322.67, gross profits from sales of $387,596.32 and a net income of $221,378.51. The return showed a total tax of $41,936.92. The balance sheet showed earned surplus and undivided profits as of June 30, 1939, in the amount of $169,493.05. The capital stock tax return filed by The Parker Appliance Company for the period ended June 30, 1939, discloses a declared value for the capital stock of $3,000,000. In a revenue agent's report dated August 20, 1941, net income was increased under agreement with the corporation to $287,868.90. Net income, less taxes, for the period January 1 to June 30, 1939, amounted to $233,298.81. A statement of income filed with the Securities and Exchange Commission for this period showed net income of $110,779.98. The Parker Appliance Company filed a Federal income and excess profits tax return for the fiscal year ended June 30, 1940, showing gross sales of $3,045,235.31, and net income of $803,562.16. In the gift tax return filed for the year 1939, petitioner reported the 250 shares of common stock of The Parker Appliance *244 Company at $92.58 per share. In the deficiency notice respondent determined that the 250 shares in question had a fair market value of $548.38 per share on January 10, 1939. Immediately after the gift of the 250 shares of common stock petitioner owned all the remaining common stock, namely, 750 shares of The Parker Appliance Company and he owned 2,000 shares which constitute all the outstanding preferred stock of the corporation. On January 10, 1939, and immediately before and immediately after that date, there had been no sales of the common stock of The Parker Appliance Company. On January 10, 1939, the 250 shares of common stock of The Parker Appliance Company had a fair market value of not less than $548.38 per share. Opinion On the sole issue of value for gift tax purposes of the shares of The Parker Appliance Co., the evidence indicates that any approach which eliminates the earning capacity of the stock must prove futile. This is principally for the reason that the company's primary earning property the contract by which petitioner licensed it to manufacture his patented devices - was not carried on the books as an asset. Any attempt to add it into the going value of *245 the concern either by means of valuing the contract itself or of attempting to measure such an intangible item as goodwill would so obviously involve a consideration of the company's earning capacity that it seems more simple to approach this phase of valuation directly. On this aspect of the matter petitioner's proposed valuation consists of two elements. First he takes the average earnings for the six previous years during which the business was operated by petitioner as the sole proprietor, and second, he capitalizes them at a 25 per cent rate. We regard both factors as excessively depreciated by his approach. The figures for orders received, shipments and profits show a generally steady expansion from the inception of the business in 1933 through 1937. It is true that the year 1938 was less favorable, but, as petitioner recognizes, this was a period of general business recession. Since a purchaser on the basic date, January 10, 1939. would be interested in the prospects for future earnings, and would look to the past only for such light as could be obtained in estimating future prospects, it would appear unwarranted to assume even that the business had yet reached its greatest *246 possibilities. It was conceded by petitioners' opinion witness that the company could be expected to prosper in relation to the airplane industry generally, and that the prospects of the latter appeared favorable for the long pull. Even, however, if we assume that the 1937 earnings represent what could be regarded as a reasonable average prospect for the future, that is far from accepting the six-year average proposed by petitioner, which includes the early years of the company's history during which it was in the formative period. As a matter of fact the earnings for the first six months of 1939 which could well have been foreshadowed in the mind of an informed buyer by conditions already existing or reasonably in prospect at the time were some $233,000, or upwards of $460,000 on an annual basis, which is more than six times the 1937 earnings, and no ground for the increased business of early 1939 other than reasonably natural expansion is indicated by the record, the sole suggestion made by petitioner being a reference to the outbreak of the European War which, of course, did not occur until the following September. Orders received in October, 1938, were the highest for any *247 month in the history of the company up to that time, and shipments in December of that year were the highest for 1938, and approximated the monthly average for the peak year of 1937. It would consequently not be unreasonable, we think, for a purchaser viewing the situation in the early part of 1939 to anticipate for the future at least as favorable earnings as the company had achieved in its best previous year of 1937. Assuming, then, anticipated annual earnings [1] of approximately $75,000 and deducting $10,000 for payment of preferred dividends, there remains $65,000 available for the common stock, or $65 a share for each of the 1,000 shares. This figure, we think, should be capitalized on a basis much higher than the four-to-one ratio suggested by petitioner. It is true the company was not large and the size of the block involved would have represented a minority interest. On the other hand, the company's product must be presumed to have been adequately protected by the patents, and the fact that petitioner was the majority stockholder might well have assured his continued interest in and devotion to the company more surely than if his share had been of less magnitude. While the *248 fixed assets were not large they were apparently adequate for the company's purposes. It was several times suggested at the hearing that evidence as to the price-earnings ratio of similar companies at the time in question might be helpful, but no such evidence appears in the record. See ; ; cf. . If reference to the 1940 World Almanca were permissible, the reason for the failure to introduce such evidence might become apparent. The 1938 earnings and closing prices of stock exchange securities are there tabulated at pages 84-92 and comparison, particularly with such aircraft industry stocks as Curtiss-Wright, North American Aviation, and United Aircraft, do not suggest that any ratio as low as four to one, or even ten to one, is justified. *249 This evidence, however, is not in the record and it suffices to point out that failure to produce the necessary figures cannot serve to establish petitioner's case. Under all the circumstances we do not regard a 10 per cent capitalization as unreasonable. Cf. . The result would be a valuation in excess of that computed by respondent. We have not considered the question solely from that standpoint, but taking all other relevant factors into consideration, have arrived at the conclusion that the valuation proposed by respondent is not too high, but if anything is lower than is warranted by all the circumstances. Cf. For the reason, however, that the figure of $548.38 is that upon which the deficiency was computed and since no increased deficiency is contended for, the latter figure has been adopted in our findings of fact as a minimum, without respect to any presumption of correctness to which respondent's figure may be entitled. Decision will be entered for the respondent. Footnotes
1. To be precise, $74,399.64. This is petitioner's own figure for 1937, adjusting the net income of the sole proprietorship, $133,000, downward to take account of petitioner's salary, royalties, rental, and corporate taxes.↩